# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| STUART SIMPSON, Individually on Behalf of Himself and Derivatively on Behalf of Nominal Defendant AMERICAN REALTY CAPITAL – RETAIL CENTERS OF AMERICA, INC., | ) ) ) ) ) | Case No. 16-CV-3970 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| LESLIE D. MICHELSON, EDWARD G. RENDELL, and EDWARD M. WEIL, JR., | ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| AMERICAN REALTY CAPITAL – RETAIL CENTERS OF AMERICA, INC. | ) ) | |
| | ) | |
| Nominal Defendant. | ) | |

## VERIFIED INDIVIDUAL AND SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Stuart Simpson ("Plaintiff"), by the undersigned attorneys, submits this Verified Individual and Shareholder Derivative Complaint (the "Complaint") against the defendants named herein, and alleges upon personal knowledge with respect to himself, and upon information and belief based upon, *inter alia*, a review of public filings, press releases and reports, and an investigation undertaken by Plaintiff's counsel, as to all other allegations herein, as follows:

## NATURE OF THE ACTION

1. This is a shareholder action brought by Plaintiff individually, on behalf of himself, and derivatively on behalf of nominal defendant American Realty Capital – Retail

Centers of America, Inc. ("ARC" or the "Company"), against the members of ARC's Board of Directors (the "Board"), seeking to remedy the defendants' violations of the federal securities laws.

2.      On April 29, 2016, the Company filed with the Securities and Exchange Commission ("SEC") a Definitive Proxy Statement on Schedule 14A (the "Proxy") setting the Company's annual meeting for June 29, 2016 (the "Annual Meeting").[1]  Defendants recommend that, at the Annual Meeting, the Company's stockholders vote to approve nine amendments to ARC's Articles of Amendment and Restatement (the "Charter").  If approved, the amendments will eliminate protections for ARC stockholders in connection with the Company engaging in a "Roll-Up Transaction" (the "Roll-Up Protections"), which the Charter defines as "a transaction involving the acquisition, merger, conversion or consolidation either directly or indirectly of the Company and the issuance of securities of a Roll-Up Entity to the holders of Common Shares," if those securities have not been listed for at least 12 months on a national securities exchange.[2] Among other things, the elimination of the Roll-Up Protections will eliminate ARC stockholders' appraisal rights in connection with a Roll-Up Transaction, as well as allow the Company to pursue a Roll-Up Transaction even if it changes ARC stockholders' voting rights and rights to inspect the corporate records of the new Roll-Up Entity, which would otherwise be prohibited under the current Charter.

3.      The Charter amendments also propose to eliminate provisions that would protect ARC stockholders from conflicts of interest transactions (the "Conflicts of Interest Protections") involving the Company's Sponsor, American Realty Capital IV, LLC (the "Sponsor"), its

---

[1] A true and correct copy of the Proxy is attached hereto as Exhibit A.
[2] The Charter defines a "Roll-Up Entity" as "a partnership, real estate investment trust, corporation, trust or similar entity that would be created or would survive after the successful completion of a proposed Roll-Up Transaction."

Advisor, American Realty Capital Retail Advisor, LLC (the "Advisor"), and its directors and officers or any of their affiliates.  Both the Advisor, which directs or performs the day-to-day business affairs of the Company and employs the Company's executive management, and the Sponsor, which founded ARC, are wholly-owned or controlled by AR Global Investments, LLC ("AR Global"), which is controlled by Nicholas Schorsch ("Schorsch").  ARC's Chairman of the Board, Chief Executive Officer ("CEO") and President, Edward M. Weil, Jr. ("Weil"), is also the CEO of AR Global.

4.      The Charter amendments further propose to eliminate provisions that restrict the Advisor's control of the Company, place caps on the Advisor's ability to generate fees in connection with services rendered to ARC, and establish a fiduciary duty of the Advisor to ARC and its stockholders (the "Advisor Protections").

5.      The Board now seeks to eliminate the Roll-Up Protections, Conflicts of Interest Protections and Advisor Protections through a majority stockholder vote at the Annual Meeting, but the Proxy's explanation for why stockholder approval is sought is materially misleading and incomplete.

6.      In the Proxy, defendants claim that eliminating the Roll-Up Protections will provide more strategic options for the Company and increased liquidity for stockholders. Likewise, the Proxy solicits the elimination of the Conflicts of Interest Protections to give the Board the "flexibility . . . to decide that a transaction negotiated for us by personnel employed by our Sponsor, our Advisor, directors or officers or any of their affiliates is in the best interest of the Company."  Further, the Proxy solicits elimination of the Advisor Protections on the basis that the Advisor will continue to be governed under its Advisory Agreement with ARC. Defendants do not disclose, however, that AR Global is planning a conflicted roll up of ARC and

other similarly situated non-traded REITs controlled by AR Global into American Finance Trust, Inc. ("AFT"), another AR Global-controlled non-traded REIT, which will then lock ARC into an extended advisory agreement that would have previously been prohibited under ARC's Charter. Accordingly, ARC stockholders are being asked to vote to give up the very protections that would be invoked in their favor in connection with this conflicted Roll-Up Transaction, without knowing that the transaction is already in the works and their vote on the Charter amendments will extinguish numerous rights designed to protect them from this Roll-Up Transaction.

7.      Indeed, as indicated in April 26, 2016 and April 27, 2016 news reports attached hereto as "Exhibit B" and "Exhibit C" (the "News Articles"), in March 2016, before the Proxy was issued, AR Global began discussions with ARC and three other non-traded REITs, Realty Finance Trust, Inc., American Realty Capital Healthcare Trust III, Inc. and Healthcare Trust, Inc. to be rolled up into AFT (the "Proposed Transaction").  The public rumors of the Proposed Transaction have been confirmed by disclosures by each of Realty Finance Trust, Inc. ("Realty Finance Trust"), American Realty Capital Healthcare Trust III, Inc. and Healthcare Trust, Inc. ("Healthcare Trust" and collectively, the "Roll-Up REITs") that the Roll-Up REITs have formed special committees to explore strategic transactions and to address potential conflicts of interest in connection with a related party transaction.[3]

8.      Moreover, as disclosed in an article by the Investment News on May 20, 2016, proposed Roll-Up REITs Realty Finance Trust's and Healthcare Trust's former director Robert Froehlich resigned his position because of certain conflicts of interest in the Proposed Roll-Up Transaction, and Realty Finance Trust's failure to disclose them to stockholders.  *See* Exhibit G. Indeed, "on May 4, 2016, he sent an email to other members of the Realty Finance Trust board,

---

[3] *See* Exhibits D (Healthcare Trust, Inc.'s April 22, 2016 press release), E (American Realty Capital Healthcare Trust III, Inc.'s April 29, 2016 press release), and F (Realty Finance Trust, Inc.'s May 6, 2016 press release).

criticizing them for not appreciating the perception of a conflict of interest in having the same executive, Nick Radesca, as chief financial officer for [Realty Finance Trust] and the other REIT, American Finance Trust, which had its name redacted in the filing." *Id.*  After the Realty Finance Trust's board of directors failed to take action in response, including "engaging a third party adviser to explore alternatives for the REIT," Mr. Froehlich resigned.  *Id.*  According, to Mr. Froehlich: "Much to my shock and surprise, the majority of the board did not concur with my assessment, which, in my mind, calls into question the level of independence of the only other independent director and the quality of corporate governance exercised by the balance of the board of directors of [Realty Finance Trust]." *Id.*  Mr. Froehlich concluded: "This is a very sad day for shareholders and an even sadder day for all the financial advisers who invested on behalf of their clients in our company because they knew . . . that I was there to protect their interests and fight for shareholder value as the lead independent of [Realty Finance Trust]." *Id.* In disclosing his resignation, Realty Finance Trust merely stated that Mr. Froehlich "notified the Board of his intention to resign early from the Board effective May 11, 2016, absent compliance with certain demands outside of the Board's prescribed governance processes."  *See* Realty Finance Trust May 19, 2016 Form 8-K.

9.      Defendants, thus, surreptitiously put in motion a two-step scheme designed to eliminate Stockholders' Roll-Up Protections, Conflicts of Interest Protections and Advisor Protections in connection with the forthcoming Proposed Transaction.

10.      Injunctive relief is required to prevent stockholders from being forced to vote on the elimination of their Roll-Up Protections, Conflicts of Interest Protections and Advisor Protections based on the misleading and incomplete Proxy which fails to disclose that the

stockholder vote is part of the defendants' two-step process designed to complete the Proposed Transaction without any protections in place for ARC stockholders.

11.     Further, the Proxy solicits stockholders to vote on multiple, separate Charter amendments that are bundled together under a single proposal.  Specifically, Proposal No. 8 bundles seven amendments together such that Plaintiff must vote for or against them all. Similarly, Proposal No. 11 bundles four.  As such, the Proxy rids Plaintiff of his right to approve, disapprove or abstain on each separate matter intended for him to vote on.  *See* 17 C.F.R. § 240.14a-4(a)(3)  and  §  240.14a-4(b)(1)  ("Rule  14a-4(a)(3)"  and  "Rule  14a-4(b)(1)", respectively).

12.     Injunctive relief is required so that Plaintiff can exercise his right to vote on each separate matter in Proposal 8 and Proposal 11 as contemplated by Rule 14a-4(a)(3) and Rule 14a-4(b)(1) of the Securities and Exchange Act.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  The Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the Defendants either resides in or maintains executive offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

**PARTIES**

15.     Plaintiff is a shareholder of the Company, was a shareholder of the Company at the time of the wrongdoing alleged herein, and has been a shareholder of the Company continuously since that time.

16.     Nominal defendant ARC is a public, non-traded REIT which was incorporated under the laws of Maryland on July 29, 2010. Its principal executive offices are located at 405 Park Avenue, 14th Floor, New York, New York 10022.

17.     Defendant Weil has been the CEO, President and Chairman of ARC and of ARC's Advisor since December 2015.  Weil previously served as an executive officer of the Company and its Advisor from their formation in July 2010 and May 2010, respectively, until November 2014.  Weil is also the CEO of AR Global.  Weil also currently serves as a director of five additional AR Global-managed REITs, including AFT, for which he serves as Chairman and CEO, and proposed Roll-Up REIT American Realty Capital Healthcare Trust III, Inc., for which he is also the Chairman.  Weil also formerly served on the board of five other AR Global-managed REITs, and formerly worked as an executive officer of at least eleven other AR Global-managed REITs, including proposed Roll-Up REITs Healthcare Trust and Realty Finance Trust. Weil has been working for Schorsch since as least 2004 when Weil worked as Senior Vice President of Sales and Leasing for American Financial Realty Trust.

18.     Defendant Edward G. Rendell ("Rendell") has served as a director of ARC since October 2012 and previously from July 2010 until March 2012.  Rendell sits on the Board's Audit and Conflicts Committees.  Rendell also serves as a director of three additional AR Global-managed REITs, including Business Development Corporation of America ("BDCA"), Global Net Lease, Inc. ("Global Net Lease") and proposed Roll-Up REIT Healthcare Trust. Rendell additionally serves as a director of Business Development Corporation of America II

("BDCA II"), an investment company managed by AR Global. Rendell previously served as a director of American Realty Capital Trust III, Inc., American Realty Capital Healthcare Trust, Inc., VEREIT, Inc., and American Realty Capital Daily Net Asset Value Trust, Inc., which were managed by AR Global's predecessor AR Capital, LLC ("AR Capital") and its affiliates. Rendell has received at least $2.4 million, including more than $1.2 million of stock awards, for his service as a director of AR Global-managed and AR Capital-managed entities over the last four years.

19.     Defendant Leslie D. Michelson ("Michelson") has served as a director of the Company since November 2015 and previously from March 2012 until October 2012. Michelson Chairs the Board's Audit Committee and sits on its Conflicts Committee. Michelson also serves as a director of two additional AR Global-managed REITs, including BDCA and proposed Roll-Up REIT Healthcare Trust. Michelson additionally serves as a director of BDCA II and as a trustee for Realty Capital Income Funds Trust, another AR Global affiliate. Michelson previously served on the boards of at least six other AR Global-managed and AR Capital-managed REITs including American Realty Capital Healthcare Trust, Inc., American Realty Capital Trust, Inc., VEREIT, Realty Finance Trust, American Realty Capital Daily Net Asset Value Trust, Inc., and New York REIT, Inc. Michelson has received at least $2.2 million, including at least $945,000 of stock awards, for his service as a director of AR Global-managed and AR Capital-managed entities over the past four years.

20.     Defendants Weil, Rendell and Michelson are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### The Individual Defendants Embark on an AR Global-Managed Roll-Up

21.     AR Global and its controller Schorsch are in turmoil.   In October 2014, American Realty Capital Properties, Inc., a formerly controlled Schorsch company, revealed a $23 million accounting misstatement that was intentionally uncorrected.  According to a November 5, 2014 Bloomberg report, the accounting errors revealed by American Realty Capital Properties, Inc. "erased almost $4 billion in market value" and led "brokers to halt sales tied to Schorsch's AR Capital LLC."  The shares of another Schorsch company, RCS Capital Corporation, "plunged more than 40 percent since the news of the accounting issues..."  RCS Capital Corporation then filed for bankruptcy in January 2016.

22.     AR Global has experienced similar problems.  In November 2015, AR Global's Transaction Agreement with Apollo Global Management, LLC ("Apollo") fell through. Under the Agreement, Apollo would have purchased a majority stake in AR Global for $378 million. Apollo and AR Global mutually agreed to terminate their agreement after Realty Capital Securities ("RCS"), the wholesale division of an AR Global-controlled public holding company, was caught engaging in proxy fraud.  News sources report that RCS' employees impersonated shareholders of the Business Development Corp of America, an AR Global-managed REIT, in order to rig the affirmative shareholder vote that was a prerequisite to Apollo's purchase.  RCS subsequently closed its business across the Country, slashing the capital that AR Global received through RCS' services.  Weil previously served as Chairman of RCS.

23.     Also, in November 2015, AR Global announced that it had stopped incorporating new, non-traded REITs.  News sources report that AR Global stopped taking new investor money for five of AR Global's newer REITs.  Because AR Global is no longer taking in any new capital as a result of its many problems, AR Global must rely on fees from its Advisory

Agreements with its AR Global-managed REITs.   However, those Advisory Agreements are in jeopardy.

24.     On December 3, 2015, Phillips Edison Grocery Center REIT II, Inc. terminated its Advisory Agreement with AR Global.  SEC filings report that the REIT paid its AR Global-controlled Advisor and its sub-advisor, collectively, at least $26.5 million under its Advisory Agreement in 2015.

25.     In January 2016, RCS Capital Corporation ("RCAP"), an AR Global-controlled corporation and the parent of RCS, filed for bankruptcy.  RCAP terminated all of its Dealer-Broker Agreements between its subsidiaries and AR Global-managed REITs.  Weil served as an executive officer of RCAP.

26.     On April 4, 2016, the United Development Funding Income V terminated its Advisory Agreement with AR Global.

27.     SEC filings report that AR Global generated over $80 million under its Advisory Agreements with AR Global-managed REITs in 2015, including $13.3 million paid by ARC to its Advisor, but only two of AR Global's Advisory Agreements are 20-years long.  Thus, as indicated by the News Reports, AR Global is rolling up half a dozen of its REITs in order to lock in "iron-clad," "difficult to break" advisory fees of enormous scope.

28.     The Proposed Transaction will involve rolling the Roll-Up REITs into AFT, which has a 20-year long Advisory Agreement with its advisor that is, of course, wholly-owned by AR Global.  The Proposed Transaction will also involve rolling American Realty Capital Global Trust II, Inc. into Global Net Lease.  Global Net Lease has a 20-year long Advisory Agreement with its advisor, also wholly-owned and employed by AR Global.  Collectively, the

Proposed Transaction involves $10.5 billion in assets, which includes ARC's $1.27 billion in assets.

29.     At least one time previously, Schorsch's REITs have solicited stockholder approval to eliminate similar stockholder protections shortly before a merger announcement.  On May 21, 2012, American Realty Capital Trust, Inc. ("ARCT") issued a Form DEF 14A soliciting stockholder approval to eliminate its stockholders' rights of appraisal in connection with a roll up transaction, as well as procedures governing conflicted transactions and ARCT's advisor's performance and compensation.   After receiving stockholder approval of the elimination of stockholder protections on July 31, 2012, just one month later on September 6, 2012, ARCT announced its agreement to merge into Realty Income Corporation..

### The Individual Defendants Seek to Eliminate ARC Stockholders' Roll-Up Protections

30.     The Proposed Transaction, whereby ARC would be rolled up into AFT, would constitute a Roll-Up Transaction under the Charter, because the transaction would involve the issuance of securities that have not been listed on a national exchange for at least 12 months. This is because both ARC and AFT are non-traded REITs.   Currently, this would trigger the Roll-Up Protections set forth in Article XIV of ARC's Charter, titled "ROLL-UP TRANSACTIONS," which states:

> (i)     In connection with any proposed Roll-Up Transaction, an appraisal of all of the Company's assets shall be obtained from a competent Independent Appraiser. The Company's assets shall be appraised on a consistent basis, and the appraisal shall be based on the evaluation of all relevant information and shall indicate the value of the assets as of a date immediately prior to the announcement of the proposed Roll-Up Transaction . . . A summary of the appraisal, indicating all material assumptions underlying the appraisal, shall be included in a report to Stockholders in connection with a proposed Roll-Up Transaction.  In connection with a proposed Roll-Up Transaction, the person sponsoring the Roll-Up Transaction shall offer to holders of Common Shares who vote against the proposed Roll-Up Transaction the choice of:

(a)     accepting the securities of a Roll-Up Entity offered in the proposed Roll-Up Transaction; or

(b)     one (1) of the following:

(I)     remaining as Stockholders of the Company and preserving their interests therein on the same terms and conditions as existed previously; or

(II)    receiving cash in an amount equal to the Stockholder's pro rata share of the appraised value of the net assets of the Company.

(ii)    The Company is prohibited from participating in any proposed Roll-Up Transaction:

(a)     that would result in the holders of Common Shares having voting rights in a Roll-Up Entity that are less than the rights provided for in Article XI hereof;

(b)     that includes provisions that would operate as a material impediment to, or frustration of, the accumulation of shares of stock by any purchaser of the securities of the Roll-Up Entity (except to the minimum extent necessary to preserve the tax status of the Roll-Up Entity), or which would limit the ability of an investor to exercise the voting rights of its securities of the Roll-Up Entity on the basis of the number of shares held by that investor;

(c)     in which investor's rights to access of records of the Roll-Up Entity will be less than those described in Sections 11.5 and 11.6 hereof; or

(d)     in which any of the costs of the Roll-Up Transaction would be borne by the Company if the Roll-Up Transaction is rejected by the holders of Common Shares.

31.     Accordingly, in the event of a Roll-Up Transaction, such as the Proposed Transaction, the Charter imbues two levels of protection on ARC stockholders.  The first relates to ARC stockholders' appraisal rights in connection with a Roll-Up Transaction.  Here, the Charter requires that in connection with any proposed Roll-Up Transaction an Independent Appraiser shall conduct an appraisal of the Company.  The Charter defines an Independent Appraiser as a "Person with no material current or prior business or personal relationship with the Advisor or the Directors."  Company stockholders must then receive a summary of the Independent Appraiser's report.  Following receipt of the Independent Appraiser's report, in the

event that a stockholder votes against the proposed Roll-Up Transaction, the stockholder must be given the choice between remaining an ARC stockholder with identical interests and rights or receiving his *pro rata* share of the Company's appraised value in cash.

32.     The Roll-Up Protections are derived from the North American Securities Administrators Association's Statement of Policy Regarding Real Estate Investment Trusts, as revised (the "Guidelines").  Because ARC was offering investments to stockholders throughout the country, the Company was required by state securities administrators to include these valuable protections to prevent abuse by REIT controllers and to mitigate risks associated with holding shares in a non-traded company.  However, now that AR Global has stopped offering new investment in ARC, ARC is no longer required to comply with the Guidelines.

33.     The clear purpose of the Roll-Up Protections is to ensure that an investor who is investing in a particular real estate asset base is not required to have their investment exchanged to incorporate other assets that they did not choose to invest in.  That is why there is optionality, following an independent appraisal, to permit ARC stockholders to remain invested solely in the assets of ARC or to receive their *pro rata* cash share of the appraised value of ARC's assets and exit their investment.  However, the Proxy states that, if Proposal 8 to amend the Charter is adopted, then Article XIV of the Charter would be deleted entirely from the Charter, removing all appraisal related protections for ARC stockholders in a Roll-Up Transaction.

34.     In the absence of these protections, ARC will not have to bring in an Independent Appraiser in connection with the Proposed Transaction to tell ARC stockholders what the fair value of ARC's assets are, and ARC stockholders will no longer have the options of remaining invested solely in ARC's assets or taking the cash value of their shares and exiting their investment.  Instead, stockholders will only have the right to approve or disapprove the Proposed

Transaction and stay invested in ARC or become a stockholder in AFT.  This will significantly reduce ARC stockholders' information concerning the Proposed Transaction and their leverage to ensure that the terms offered in the Roll-Up Transaction are fair.

35.    The second level of protections that are removed by Proposal 8 to amend the Charter relate to ARC's ability to even pursue a Roll-Up Transaction.  Under subsection (ii) of Article XIV of the Charter, ARC cannot pursue a Roll-Up Transaction if ARC stockholders would have different voting rights or would no longer have the right to inspect the books and records of the new Roll-Up Entity.  These are important protections that will be affected in the Proposed Transaction as, at a minimum, ARC stockholders will not have inspection rights in AFT and may have their voting rights changed in connection with the Roll-Up Transaction. Accordingly, without the Charter amendments being passed, it would be impossible for AR Global to pursue its roll up plan, because ARC would be prohibited from engaging in such a transaction.

**The Individual Defendants Seek to Eliminate
the Charter Provisions Governing Conflicted Transactions**

36.    Section 10.3 of Article X of ARC's Charter prohibits the Company from engaging in any "transaction with the Sponsor, a Director, the Advisor or any Affiliates thereof unless a majority of the Directors (including a majority of the Independent Directors) not otherwise interested in such transaction approve such transaction as fair and reasonable to the Company on terms and conditions not less favorable to the Company than those available from unaffiliated third parties."

37.    The Company's roll up into AFT triggers Section 10.3 because both the Company and AFT are indirectly controlled by AR Global through their respective advisors.  As such, the

Charter requires that a majority of the Company's Independent Directors approve the Roll-Up Transaction.

38.     The Charter defines an "Independent Director" as a "Director who is not and who has not been within the last two years, directly or indirectly associated with the Sponsor or the Advisor by virtue of . . . employment by the Sponsor; the Advisor or any of their Affiliates . . . [or] service as an officer or director of the Sponsor, the Advisor or any of their Affiliates . . . ."[4]

39.     Defendant Weil, by virtue of his employment as CEO of the Company's Advisor and AFT is clearly not an Independent Director.   Moreover, considering defendants Michelson's and Rendell's connections with various other AR Global-affiliated entities, their independence under the Charter to approve a conflict transaction is highly questionable as well.   Defendant Michelson sits on the boards of BDCA, Healthcare Trust, and BDCA II which are all indirectly controlled by AR Global through their Advisors.   Defendant Rendell sits on the boards of BDCA, Healthcare Trust, BDCA II, and Global Net Lease, which are also indirectly controlled by AR Global through their Advisors.   Likewise, AFT is indirectly controlled by AR Global through its Advisor.   As such, defendants Michelson and Rendell serve as directors of AR Global entities that are under common control with AFT through a common, indirect controller (AR

---

[4] The Charter defines "Affiliate[s]" as "(i) any Person directly or indirectly owning, controlling or holding, with the power to vote, ten percent (10%) or more of the outstanding voting securities of such other Person; (ii) any Person, ten percent (10%) or more of whose outstanding voting securities are directly or indirectly owned, controlled or held, with the power to vote, by such other Person; (iii) any Person directly or indirectly controlling, controlled by or under common control with such other Person; (iv) any executive officer, director, trustee or general partner of such other Person; and (v) any legal entity for which such Person acts as an executive officer, director, trustee or general partner."   The Charter further defines "Person" as "an individual, corporation, partnership, estate, trust (including a trust qualified under Sections 401(a) or 501(c)(17) of the Code), portion of a trust permanently set aside for or to be used exclusively for the purposes described in Section 642(c) of the Code, association, private foundation within the meaning of Section 509(a) of the Code, joint stock company or other legal entity . . . ."

Global), and they cannot provide the majority vote of Independent Directors that Section 10.3 requires to approve the conflicted roll up of the Company into AFT.

40.     Further, the elimination of the requirement that the terms of any conflicted transaction be not less favorable to the Company than those available from unaffiliated third parties removes a heightened burden on ARC to ensure that any conflicted roll up transaction would be at fair market value.  Removal of this provision allows AR Global to manipulate the terms of the roll up of the Company into AFT, including how ARC's assets may be valued in the Proposed Transaction as compared to the other Roll-Up REITs and AFT.

### The Individual Defendants Seek to Eliminate
### the Charter Provisions Governing the Advisor

41.     Article VIII of ARC's Charter addresses the Advisor's relationship with the Company, setting forth the Advisor Protections.  Specifically, Article VIII limits the length of the Advisory Agreement, caps the Advisor's compensation, and requires the Board to review the Advisor's performance and evaluate the Advisor's compensation.  Article VIII also instills a fiduciary duty in the Advisor to ARC and ARC's stockholders.  The Individual Defendants seek to delete Article VIII in its entirety via Proposal No. 11.

42.     Article VIII, Section 8.1 of ARC's Charter requires that the "[t]he term of retention of any Advisor shall not exceed one (1) year . . . ."  The Company's current Advisory Agreement expires on June 30, 2016, the day after the Annual Meeting.  Eliminating this Article of the Charter will allow the Board, in connection with the Proposed Transaction, to lock ARC into the same 20-year advisory agreement that AFT has with its advisor.

43.     Article VIII, Section 8.2 requires the Board to "evaluate the performance of the Advisor before entering into or renewing an Advisory Agreement . . . ."   In evaluating the Advisor, the Independent Directors will consider, among other things, whether:

-16-

the expenses incurred are reasonable in light of the investment performance of the Company, its Net Assets, its Net Income and the fees and expenses of other comparable unaffiliated REITs…[whether] the performance of the Advisor and…the compensation to be paid to the Advisor is reasonable… [and] the performance of the Advisor and the compensation paid to the Advisor by the Company in order to determine that the provisions of the Advisory Agreement are being carried out…

44.    Eliminating Section 8.2 puts ARC at heightened risk that the Advisor's performance or compensation will fall outside the range of reasonableness following the Proposed Transaction.   The Board will not have to review the Advisor's performance or compensation annually, and thereby allows AR Global to force upon ARC a new advisory fee paradigm in connection with the Proposed Transaction that benefits AR Global and locks in advisory fees for 20 years without oversight.

45.    Proposal 11 further eliminates numerous caps on ARC's Advisor's various fees that it can earn in connection with its provision of services to ARC   For example, Article VIII, Section 8.6 allows the Company to "pay the Advisor a real estate commission upon Sale of one (1) or more Properties, in an amount equal to the lesser of (i) one-half (1/2) of the Competitive Real Estate Commission if a third party broker is also involved, or (ii) two percent (2%) of the sales price of such Property or Properties."   The Charter's definition of "Sales" includes "any transaction or series of transactions whereby: (A) the Company or the Operating Partnership directly or indirectly . . . transfers . . . its ownership of any Property . . . ."   Accordingly, under the terms of the Charter, the Proposed Transaction will generate advisory fees for ARC's Advisor in the roll up of ARC's assets into AFT.   Deleting Section 8.6 does away with the limits on the Advisor's commission in connection with the Proposed Transaction.

46.    Likewise, Article VIII, Section 8.10 limits the Advisor's Reimbursement for Total Operating Expenses.   Section 8.10 states:

The Company may reimburse the Advisor, at the end of each fiscal quarter, the Total Operating Expenses incurred by the Advisor; *provided, however*, that the Company shall not reimburse the Advisor at the end of any fiscal quarter for Total Operating Expenses that, in the four consecutive fiscal quarters then ended, exceed the greater of two percent (2%) of Average Invested Assets or twenty five percent (25%) of Net Income (the "**2%/25% Guidelines**") for such year.[5]

47.     Further, Section 8.10 states that "[t]he Independent Directors shall have the fiduciary responsibility of limiting Total Operating Expenses to amounts that do not exceed the 2%/25% Guidelines…"

48.     Eliminating Section 8.10 relieves the Board of its fiduciary duty to ensure the Advisor is not being overpaid.  The new Advisor relationship that ARC will have upon its roll up into AFT will therefore not have any of the protections that ARC stockholders are currently provided with under the Charter to ensure that the Advisor's advisory fees are reasonable.

49.     The Individual Defendants also seek to eliminate the Advisor's "fiduciary responsibility and duty to the Company and to the Stockholder[s]" under Article VIII, Section 8.3 of ARC's Charter.  Deleting this provision takes away the duties of the Advisor to ARC and ARC's stockholders to protect against the inherent conflicts of interest that arise from AR Global's control of the Advisor, which will be at the forefront of the Proposed Roll-Up Transaction.  This duty is even more important when there are no limits on the amount of

---

[5] The Charter defines Total Operating Expenses as: "all costs and expenses paid or incurred by the Company, as determined under generally accepted accounting principles, that are in any way related to the operation of the Company or to Company business, including advisory fees, but excluding (i) the expenses of raising capital such as Organization and Offering Expenses, legal, audit, accounting, underwriting, brokerage, listing, registration, and other fees, printing and other such expenses and tax incurred in connection with the issuance, distribution, transfer, registration and Listing of the Shares, (ii) interest payments, (iii) taxes, (iv) non-cash expenditures such as depreciation, amortization and bad debt reserves, (v) incentive fees paid in compliance with the NASAA REIT Guidelines, (vi) Acquisition Fees and Acquisition Expenses, (vii) real estate commissions on the Sale of Properties, (viii) Financing Coordination Fees and (ix) other fees and expenses connected with the acquisition, disposition, management and ownership of real estate interests, mortgage loans or other property (including the costs of foreclosure, insurance premiums, legal services, maintenance, repair and improvement of property)."

Advisor fees the Advisor can incur, as will happen if ARC's stockholders approve these amendments at the Annual Meeting.

**The Individual Defendants Issue an Incomplete and Misleading Proxy to Facilitate the Elimination of ARC  Stockholders' Roll-Up Protections, Conflicts of Interest Protections and Advisor Protections so as to Permit the Proposed Transaction to Proceed**

50.     The Proxy is replete with material misstatements and omissions concerning the effect the proposed amendments will have and the Board's bases for proposing them.

51.     The Proxy fails to provide any information regarding AR Global's planned Roll-Up Transaction.  Instead, the Proxy misleadingly and incompletely explains on page 35 that:

> [The Roll-Up Protections] provide[] that prior to conducting a roll-up transaction, we would be required to obtain an appraisal of the Company's assets. In addition, as part of the roll-up transaction, we would be required to provide stockholders certain rights including the right to remain as a stockholder of the Company and preserve their interests therein on the same terms and conditions as existed previously, or to receive cash in an amount equal to the stockholders pro rata share of the appraised value of the net assets of the Company, even if the Board of Directors concludes that transaction would be in the Company's best interests. We believe deleting [the Roll-Up Protections] will increase our flexibility and allow greater optionality for the Company, including but not limited to the possibility of strategic transactions that could otherwise be difficult given the existing provisions, such as a transaction with another entity whose securities have not been listed on a national securities exchange for at least 12 months. These provisions are also potentially ambiguous and may limit the ability to engage in a transaction involving our securities if our securities have not been listed on a national securities exchange for at least 12 months among other substantive transactional requirements. The Board of Directors believes that deleting this provision will provide us with greater options to pursue a transaction that will provide our stockholders with liquidity.

52.     However, the Proxy does not disclose that stripping ARC stockholders of their Roll-Up Protections will facilitate an AR Global-managed Roll-Up Transaction on terms likely to AR Global's liking because stockholders will no longer have the benefit of an automatic, independent appraisal of the fair value of their *pro rata* shares which stockholders can use to assess the fairness of the Proposed Transaction consideration.

53.     The Proxy is also materially misleading and incomplete regarding its disclosures concerning Proposal 11, which would amend the Charter to eliminate the Conflicts of Interest Protections.   The Proxy states that the Board is soliciting the elimination of Article X of the Proxy because the "Board of Directors should have the flexibility . . . to decide that a transaction negotiated for us by personnel employed directly by our Sponsor, our Advisor, directors or officers or any of their affiliates is in the best interest of the Company."   This explanation is materially incomplete and misleading by failing to tell ARC stockholders that eliminating these protections will facilitate the conflicted roll up of the Company into AFT.

54.     The Proxy also solicits approval to lift the Charter's restrictions on the Individual Defendants' ability to vote their shares in favor of a conflicted transaction submitted to a stockholder vote.   Section 11.4 of the Charter provides that "[w]ith respect to shares of stock owned by the Advisor, any Director or any of their Affiliates, neither the Advisor, nor such Director(s), nor any of their Affiliates may vote or consent on matters submitted to the Stockholders regarding . . . any transaction between the Company and any of them."   Deleting this Section will allow the Individual Defendants to vote their shares in favor of the Company's conflicted roll up when they otherwise could not.   The Proxy is materially misleading and incomplete by failing to disclose this.   The Proxy simply states that "[if] adopted, this proposal would delete this provision entirely."

55.     The Proxy is materially misleading and incomplete regarding Proposal 11 to strike the Charter's provisions that govern the Advisor.   The Proxy provides little transparency into the Individual Defendants' reasoning for deleting these supervisory responsibilities.   The Proxy merely states:

> Our relationship with the Advisor will continue to be governed by the agreement
> between the Company and the Advisor described under 'Certain Relationships

and Related Transactions – Advisor,' which includes many provisions that correspond to the provisions of Article VIII, but the possibility will exist for future amendments to the Advisory Agreement that would not have been permitted under the Charter currently in effect.

56.     However, this disclosure is incomplete and misleading, because of ARC's failure to disclose the Proposed Transaction, which will increase ARC's Advisors' contract from 1 year to 20 years upon the roll up into AFT.  This is particularly material, considering the other Advisor-related Charter amendments that seek to eliminate the caps on the Advisor's compensation, the Board's duty to supervise the Advisor or review its compensation, and the Advisor's fiduciary responsibilities to the Company and its stockholders.

57.     The Proxy asks ARC stockholders to strike the Charter's provisions that put limits on the Advisor, and yet the Advisory Agreement which would thereafter provide governing provisions will expire the day after the Annual Meeting on June 30, 2016.  This will give AR Global free reign to modify ARC's advisory agreement in connection with the Proposed Transaction, which is not disclosed to ARC stockholders.

58.     The Individual Defendants' incestuous relationship with AR Global clearly caused the Individual Defendants to make incomplete and misleading disclosures concerning the impending Proposed Transaction and the effect that the elimination of the Roll-Up Protections, Conflicts of Interest Protections and Advisor Protections will have on AR Global's ability to consummate the Proposed Transaction on terms of its liking.

59.     The Proxy is, thus, replete with materially incomplete and misleading disclosures, which unlawfully deprives stockholders of their right to cast a fully informed vote at the Annual Meeting.

### The Proxy Impermissibly Bundles Separate Matters
### in Violation of Rules 14a-4(a)(3) and 14a-4(b)(1)

60.     The Individual Defendants caused the Proxy to be issued in a manner that bundles

separate matters together in violation of Rules 14a-4(a)(3) and 14a-4(b)(1) of the Securities and

Exchange Act.

61.     Proposal No. 8 solicits ARC stockholders to approve seven separate amendments

to the Charter, including: (1) eliminating Section 5.14, ARC's share repurchase program,[6] (2)

eliminating Section 5.15, ARC's Distribution Reinvestment Plans, (3) eliminating Article IX,

ARC's Investment Objectives and Limitations,[7] (4) eliminating Article XIV, ARC's Roll-Up

Protections, (5) eliminating Article XV, which governs procedures regarding ARC's liquidation,

---

[6] The Proxy cites Section 5.14 of the Charter as providing that "[t]he Board may establish, from time to time, a program or programs by which the Company voluntarily repurchases shares of stock from its Stockholders; *provided, however,* that such repurchase does not impair the capital or operations of the Company.  The Sponsor, the Advisor, the Directors or any Affiliates thereof may not receive any fees arising out of the repurchase of stock by the Company."

[7] The Proxy explains that Article IX, Section 9.3 includes the following investment restrictions: "Clause (i) states that not more than 10% of our assets may be unimproved real property or mortgage loans or unimproved property.  Clause (ii) states that we may not invest in commodities or commodity futures contracts except for hedging purposes.  Clauses (iii) through (v) prohibit investments in mortgage loans without an appraisal or if the aggregate of all mortgage loans secured by the investment or unimproved property exceeds 85% of the appraised value or that are subordinate to any mortgage or equity interest of any director of affiliate thereof.   Clause (vi) prohibits the Company from issuing certain securities. Clause (vii) requires approval by a majority of the Board of Directors, including a majority of the independent directors, for consideration paid for real property and an independent appraiser if such property is acquired from an affiliate.   Clause (viii) requires the Company to review its investment activities to attempt to ensure that it is not classified as an "investment company" under the Investment Company Act of 1940.  Clause (ix) prohibits the Company from making investments that it believes will be inconsistent with its objectives of qualifying as a REIT. Clause (x) prohibits the Company from investing in real estate contracts of sale unless such contracts are in recordable form. Clause (xi) prohibits the Company from lending money to any of the directors or executive officers. Clause (xii) prohibits investments in private equity securities unless approved by a majority of the Board of Directors, including a majority of the independent directors, as being fair, competitive and commercially reasonable. Clause (xiii) prohibits the Company from engaging in any short sales. Clause (xiv) prohibits the Company from engaging in trading, as compared with investment activities. Clause (xv) prohibits the Company from underwriting activities. Clause (xvi) prohibits the Company from investing in foreign currency or bullion. Clause (xvii) prohibits the Company from engaging in borrowing that would result in asset coverage of less than 300%. Clause (xviii) prohibits the Company from acquiring interests or securities in any entity holding investments or engaging in activities prohibited by Section 9.3."

(6) eliminating Section 11.8, which governs restriction on tender offers; and (7) eliminating

Section 5.8, which governs the financial requirements for prospective investors.

62.     Because Proposal No. 8 impermissibly bundles these seven different proposed

amendments, Plaintiff must accept or reject them all  in violation of his rights under SEC Rules

14a-4(a)(3) and 14a-4(b)(1).

63.     SEC Rule 14a-4(a)(3) provides:

(a)   The form of proxy . . .

(3) Shall identify clearly and impartially each separate matter intended to be acted upon,
        whether or not related to or conditioned on the approval of other matters . . .

§ 240.14a-4(b)(1).

64.     SEC Rule 14a-4(b)(1) provides:

Means shall be provided in the form of proxy whereby the person solicited is afforded an
opportunity to specify by boxes a choice between approval or disapproval of, or
abstention with respect to each separate matter referred to therein as intended to be acted
upon . . .

§ 240.14a-4(b)(1).

65.     The Proxy's Proposal No. 11 also bundles separate matters, including: (1)

eliminating Article VIII, which encompasses the Advisor Protections, (2) eliminating Article X,

which encompasses the Conflicts of Interest Protections, (3) eliminating Section 11.4, which

prohibits votes by the Advisor or ARC's directors and their affiliates from counting in

connection with the removal of the Advisor or related-party transactions, and (4) changing

Sections 12.2 – 12.3 to increase the exculpation and indemnification of ARC's officers and

directors "to the maximum extent possible permitted by the MGCL."

66.     In bundling these amendments together under Proposal No. 11, the Proxy again

dispossesses Plaintiff of his right to vote separately for each matter intended for him to vote on.

Accordingly, the Individual Defendants' violated SEC Rules 14a-4(a)(3) and 14a-4(b)(1) by issuing Proposal No. 11 of the Proxy.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

67.     Plaintiff brings this action derivatively in the right for the benefit of ARC to redress the Individual Defendants' derivative violations of the federal securities laws.

68.     Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

69.     As a result of the facts set forth herein and the timing of the Annual Meeting, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants.   Under Maryland law, which governs the Court's futility analysis, demand is excused if a delay in awaiting a response to a demand would cause irreparable harm to the corporation.   Here, because the uninformed vote on the Charter amendments will cause irreparable harm to the Company, and there is insufficient time before the Annual Meeting to await a response from the Company to a demand and then secure relief from this Court in advance of the stockholder vote, demand is excused.

## COUNT I

**Individual and Derivative Claim Against the Individual Defendants For Violations of §
14(a) of the Securities Exchange Act in Connection with the Proxy**

70.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if set forth fully herein.

71.     Plaintiff brings this claim individually on behalf of himself and derivatively on behalf of ARC.

72.     Rule 14a-9, promulgated pursuant to § 14(a) of the Securities Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in light of

the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

73.     The Proxy violates § 14(a) and Rule 14a-9 because the Individual Defendants omitted material facts necessary to make the Proxy not false and misleading, specifically, the fact that eliminating the Roll-Up Protections, Conflicts of Interest Protections and Advisor Protections will facilitate an incipient Roll-Up Transaction with multiple AR Global-managed REITs.

74.     The misrepresentations and omissions in the Proxy are material, and Plaintiff and the Company will be damaged if the Roll-Up Protections, Conflicts of Interest Protections and Advisor Protections in the Charter are eliminated as a result of the incomplete and misleading information in the Proxy.

75.     Rule 14a-4(a)(3), promulgated pursuant to § 14 of the Securities Exchange Act, provides:

> (a)     The form of proxy . . .
>
> (3)     Shall identify clearly and impartially each separate matter to be acted upon, whether or not related to or conditioned on the approval of other matters . . .

17 C.F.R. § 240.14a-4(a)(3).

76.     Rule 14a-4(b)(1) provides:

> Means shall be provided form of proxy whereby the person solicited is afforded an opportunity to specify by boxes a choice between approval or disapproval of, or abstention with respect to each separate matter referred to therein as intended to be acted upon . . .

17 C.F.R. § 240.14a-4(b)(1).

77.     The Individual Defendants violated Rules 14a-4(a)(3) and 14a-4(b)(1) by causing the issuance of a Proxy which impermissibly bundles separate matters to be voted on. Specifically, Proposal No. 8 bundles seven separate matters and Proposal No. 11 bundles four. In so doing, the Individual Defendants attempt to prevent Plaintiff from exercising his right to vote on each matter separately.

78.     Plaintiff and the Company will suffer irreparable harm if the misleading and omitted information in the Proxy is not corrected and Proposals No. 8 and No. 11 in the Proxy are not unbundled to allow individual votes on the unrelated Charter amendments.

WHEREFORE, Plaintiff demands judgment as follows:

A.     Enjoining the Annual Meeting unless and until the Individual Defendants cure the materially incomplete and misleading Proxy;

B.     Granting appropriate equitable relief to remedy the Individual Defendants' violations of the federal securities laws;

C.     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

D.     Granting such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Plaintiff demands a trial by jury.

Dated:  May 26, 2016

Respectfully Submitted,

GRANT & EISENHOFER P.A.

Daniel L. Berger
dberger@gelaw.com
485 Lexington Avenue
New York, NY 10017
Telephone: (646) 722-8500
Facsimile: (646) 722-8501

KESSLER TOPAZ
  MELTZER & CHECK, LLP
Lee D. Rudy
lrudy@ktmc.com
J. Daniel Albert
dalbert@ktmc.com
Michael C. Wagner
mwagner@ktmc.com
Stacey A. Greenspan
sgreenspan@ktmc.com
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (267) 948-2512

*Attorneys for Plaintiff*